et al, case number 251085. I want to make sure that Mr. Rivkin, can you hear us? Yes I can your honor, thank you. Okay, why don't we proceed and if at any time, Mr. Rivkin, you cannot hear us for whatever reason, or there's a technical glitch, just raise your hand and I'll try to make sure to see that, okay? Thank you your honor. Please proceed. Good morning your honors, may it please the court. This is not a dispute about who should be a bishop. This is not a suit about whether the plaintiff was actually elected bishop. There is no challenge to any church doctrine and the court is not being asked to opine or decide any issues of doctrine or religious governance. This is a defamation case on a straightforward and secular basis. The defendants publicly accused my client, Fr. Alexander Belya, of forging official church letters. Letters that bore genuine signatures of Metropolitan Illarion, as established by… No, I would not your honor. Wait, really? So he could have a claim to be instated as an official of the church and you're saying that wouldn't interfere with the church governance? He's not asking for a real statement. No, I know. That was my hypothetical was if it's the same facts, but he doesn't just want damages, he wants to be, he wants the appointment. Wouldn't that be a problem? But that would be a very different case. My client… But I guess that's my question. So if it's the same facts, if we're like trying to involve, we're sitting in review of the decision making process by which he was, there was the initial letter and then it was revoked and so on and it's about the appointment of a church official. Why, if he's seeking damages for not getting the appointment as versus seeking the appointment itself, isn't the court still doing the same thing and looking into this? No, your honor. No, your honor, respectfully, the issue of whether or not he was elected need not even be brought up to the jury. The only issue presented to the jury is whether he, to be presented to the jury, is whether he had in fact forged these letters. Whether or not he was elected or not is not even an issue that needs to be presented to the jury at all. Well, but isn't this, isn't that a rather narrow view of the case? I mean, you say that the genuineness of the letters is established by your handwriting expert. I take it what you mean by that is that your evidence will consist of the testimony of a handwriting expert, which you would argue to the jury establishes their authenticity. But, of course, the jury would have to assess the credibility of the expert, right? Correct. So that would be an issue. And the defendants then would argue that the circumstantial evidence would suggest that this either was not really the signature of the Metropolitan or perhaps that somehow the Metropolitan was duped or induced somehow to sign. Something without fully understanding it. I imagine that. Well, and so and what would their circumstantial evidence be? Would it not be that there are irregularities about the content of the letter that this isn't how it's done in the church? This isn't the kind of letter that would establish the appointment in question. Wouldn't that be their argument? No, Your Honor, respectfully. I think we're going to hear from them that it is their argument. I think what you tell us is why does that not matter? Because it seems to me that if that defense is presented, that the contents of the letter demonstrate that it could not possibly come from the Metropolitan. Would that not require the jury to assess whether their understanding of the way things are done is accurate? Well, here's the thing, Your Honor. None of the defendants have denied the authenticity of the signature. None of the they have offered no expert rebutting our expert. Why do they need an expert? Why can't they make other arguments as to why what they actually said anyway, which may lead a reasonable jury. I think you have a case that would have to go to a jury as to whether the substance of their letter effectively charges forgery. But what they actually say is that it has irregularities and that their conclusion is that the contents of this were not known to the Metropolitan. Isn't that what the letter actually says? Well, we're talking about specific. Yes, we're talking about two different things, it seems to me. On the issue of damages, which is what Your Honor started with, on the issue of damages, we're only all that needs to be decided by the jury is whether or not my client had forged the letters. I don't think that's entirely true. It's a matter of inference that and a reasonable inference, I grant you. It's something you are perfectly free to argue to the fact finder that this their letter implies and is intended to imply, if you care to say that, that these are forgeries. But what they actually say is not directly. This is a forgery. They say these are weird letters and we don't think or we assert that the Metropolitan did not know its contents. Well, you're perfectly free to say that means that must mean the reasonable reader would interpret that as an allegation that he forged the letters. But if they come in and say, well, wait, this is, you know, all we're saying is this. These letters couldn't possibly have been knowingly signed by the Metropolitan because they defy church practice and are inconsistent with the way that the church is organized and conducts elections of bishops. Why are you saying that the judge could not allow them to present that defense? Not well, given the evidence, the overwhelming evidence that these that the signature of the Metropolitan is genuine and that he wrote the letters, that it's not just about the signatures. It's also what is what is the evidence? What is the evidence other than Father Belia's testimony that is affirmative evidence that he wrote the letters as opposed to I understand the argument that he there's strong evidence that he signed it coming from the handwriting expert. They do not deny that he wrote the letters, not a single one of them deny. And well, how would they know other than from the inferences that they're drawing from the content of the letters? They weren't present. They can't say I saw him not write the letter. There's no such thing. Right. Right. I believe this issue was already decided by this court on the on the first on the first. Oh, I don't think so whatsoever. What happened at the first stage was a question of what will we do on the pleadings? We now have a more full record and a better understanding of what the issues are going to be at trial. You are again. I do not believe that it is that any defense by the defendants here to whether or not my client had fabricated and signed the letters, forged the letters requires delving into into religious dogma. If it might involve a question of whether. Why is it? So why is that? This is even matter whether it involves digging into religious dogma. Let's say that your version of the fact is correct. Let's say the original appointment letter was genuine. And then other church officials came along later and lied and said the original letter was a forgery and therefore shouldn't be honored. And the end result was that the church did not appoint Belia Bishop of Miami. Even if that is the version of events that happens, you would still say like a court can't order the the Russian Orthodox Church to accept him as the bishop of Miami. Right. Even if the reason he was rejected was based on a fraudulent letter. Right. Because the court can't order a religious institution to accept a religious official. Right. Correct. Okay. So if that's correct, then why would it be a different result to say that a court could order the Russian Orthodox Church to pay money for the way it decided not to appoint somebody a religious official? Wouldn't that be the same kind of court intervention in the affairs of the church? That is not what we're seeking at all. We're seeking damages for solely for the for the accusation of defamation. Your Honor, let me put it. Let me put it this way. But I'm saying if they have a privilege that they get to decide who are their religious officials and courts can't intervene in that decision. Why do courts get to scrutinize the reasons they give internally for reaching that decision? The courts get to the courts get to decide whether or not an accusation of forgery, which is a non-ecclesiastical, non-doctrinal issue, was was actionable. And the church is not immune from from falsely accusing somebody of being a criminal court. So if the church just kind of gratuitously issued a press release defaming somebody out in the world, certainly those people could sue for defamation. The question here is because this is an internal governance decision, whether a different analysis applies. And you said, well, it does. Even if the church, you know, denied him the bishop post for fraudulent reasons, a court can order that rectified by giving him the appointment. But it just seems like you're repackaging that sort of claim by saying, well, instead of giving him the appointment, we're going to give him damages. No, Your Honor. Based on the same inquiry and the same facts. If my client was accused of murder by the church and said we're dismissing him because he killed somebody or he molested a child, those accusations, independently of his dismissal, would be actionable. That's the question. I mean, you're just sort of restating the question to be decided. Can I ask this other thing? So even if I thought that the damages, that giving him damages was different than giving him the appointment, in order to calculate the damages, you know, the purported defamation harms his career as a religious official in the Russian Orthodox Church. Wouldn't then the court also have to talk about how it's going to affect his career as a religious official in order to decide what damages he suffered like that? Like wouldn't even the calculation of damage itself involve the court in, you know, how the church and different parishes and whatnot would react to the accusation, how seriously it would be taken, how likely it was that he could continue his chosen career as a religious minister and these kinds of things? Respectfully, no, Your Honor. We have an expert who has analyzed, whose analysis of the defamation, of the spread of the false information about my client is limited solely to the statement of forgery. The expert, we have an expert… I understand, but the harm, the reputational harm that Velia suffered is a harm to his ability to get future religious appointments. Like that is his career, right? That's not quite, Your Honor, not quite. If the issue of the expert report did not come into the summary judgment, I mean, the expert reports were submitted, but it's the part of the cost of the damages, in addition to the psychological damages, is the reformation of his reputation is the cost of that. How is that cognizable under New York law, which requires a showing of special damages? Well, I don't think that's… You're not… Well, go ahead. You answer that question, then I've got a follow-up question. Okay. I believe that the cost of reformation of damages is recoverable under New York law. This was allowed in the… I mean, what you're saying is you're not seeking loss income. Your client's not seeking loss income from the loss of parishioners. It's all reputational injury. Is that correct? It's reputational injury, yes. What is the pecuniary or economic loss? The economic loss is the cost of rebuilding his reputation, which is recoverable and has been allowed by courts. There is a technical term for it, which now, for now… What's the best New York law case for that? I believe it's the Trump, the two Trump cases. The two Trump cases, okay. Yes, and I can't give you the site right now, but those were the… You mean the Carroll cases, the two Carroll cases? In fact, our damage expert tracks the damages and the reasoning and the rationale in his expert report exactly the way it was presented. I mean, so, you know, I'm familiar with those cases. I mean, part of that is about rehabilitating the reputation of Carroll as an advice columnist who had a journalism career. Like, so it's not as if you could think about her reputation – the harm to her reputation unless you take account of what her reputation was before and what her career was. So I guess that brings me back to the question I was asking earlier. Your client's career is as a religious official in the Russian Orthodox Church. And so to decide the cost of the harm to his reputation, wouldn't you have to evaluate how the accusation of forgery affected his reputation within the church and his ability to pursue a career as a priest and these kinds of things? Doesn't that also involve the cost? No, the rehabilitation cost. No, Your Honor, the rehabilitation cost is a specific cost. This is – you hire a company to conduct a rehabilitation campaign. When you say rehabilitation cost, is that a cost that naturally or directly flows from the harm to reputation? Yes, I believe so. He was accused of being a forger. He was accused of being a forger. How is that different from any form of actual damages as opposed to, as I understand it, the special damages that New York law requires? I'm not sure I understand the question. I'll repeat it. How is that different? That was what you're describing, sort of the rehabilitation costs that are associated with reputational injury. How is that different from the actual differences as opposed to special damages? I believe the jury is well – it's well within the purview of the jury to decide that there were X number of views or clicks on his – on the charge of forgery which were counted. That's for – that affects his reputation. You, as I understand it, have dislaimed any claim of damages for lost compensation, lost income, anything like that. That's correct. And you're pointing – He makes no money. He makes no money. You're pointing us to a category of damages that New York recognizes as actual damages, but in the context of defamation matters or cases, it also requires special damages. So tell me – point to me where the special damages are. Okay, Your Honor, if I may. We can talk about exceptions. We can talk about the constitution. But I'm just looking at New York law, and I believe the district court had or concluded that you failed on summary judgment with respect to proving defamation fully under New York law. Well, the defamation fully under New York law, that was – the court decided that there was a lack of proof of publication, which I'll be happy to discuss. And also because the court decided that in order to – in order to decide damages, the court would need to delve into religious issues. There's a second – and what I'm suggesting – but, you know, it's really in the form of questions. There might be a second problem with damages, namely special damages and the New York law requirement to show – I don't believe that issue came up on summary judgment. On publication – on publication, and I think you know what the district court judge said, but on the first Facebook posting by Olga – Olga Sibin, yes. The question was whether there was any evidence that the defendants – and Ms. Sibin is not a defendant – personally participated in her posting. What is the evidence of that? I don't believe the issue was whether Ms. Sibin personally participated in the posting. No, no, no, whether the defendants participated and approved the posting. Right. As we say in our brief and we lay out the chronology, there is ample circumstantial evidence that the only person from whom Ms. Sibin could have gotten it was one of the defendants and that this was – And what is – just remind me, what is the nature of the circumstantial evidence? Okay. Well, Ms. Sibin is a cosmetologist in Miami. Her husband, Sibin, was – who was – who – who was – along with another individual was involved – was engaged by the defendants in the summer, receiving the September 3rd letter in a campaign to destroy the plaintiff and a campaign to gather evidence, bad evidence, false evidence. And where did you – where is that – what is the evidence of that? Well, there's – there's – well, there's – his statement is in there. That's the – that's the notarized statement? And also there are emails, and there are emails between him and the defendants that confirm the veracity of his statement. And why aren't those emails – why aren't those emails and those statements hearsay? So – Well, they're – What? Your Honor, I don't think they have been disputed by the defendants. For one thing, they involve defendants themselves. There's an email by Lachowski, defendant Lachowski, communicating with – with one of the two, Sibin and the other person, Babenko. And as far as where they're hearsay, they're records of the church. Okay. They're internal records of the church. One more question about the New York law – about the New York law claim on the merits. So New York law recognizes a qualified common interest privilege for communications related to an employment decision like this. And then to overcome such a privilege, you would need to show that the defamation was motivated solely by common law malice. So it doesn't seem like you dispute that these communications do relate to an employment decision of the church. Is your argument that for some reason the qualified privilege doesn't attach? Or do you think you could show that the defamatory statement was motivated solely by malice? We can show that the – that the communication – that the defamatory statements were motivated by legal malice. Absolutely, there is – we have no doubt about that. It has to be solely by malice, right? That has to be the sole motivation because that's the point of the qualified privileges. Which is reckless disregard for the truth as well. Yes. They knew perfectly well – they drafted this letter. Okay. You're saying – you're saying if you could show that they knowingly lied about the forgery, that would overcome the qualified privilege. That's correct. And besides, the qualified privilege was not even an issue that was discussed on the summary judgment motion. It's something that the defendants threw in at the – on their reply, which we didn't have a chance to do. I'm interested in it anyway. Thank you. Why don't we hear from the appellees? Ms. Thompson, good morning. Good morning, Your Honors. May it please the Court. Diana Thompson for the defendants' appellees. Now that the Court has the facts, Father Alexander's claims fail for three reasons. First, they fail under the ministerial exception because he's a minister. I'm sorry. Can you put the microphones a little closer? Yes. Thank you. First, they fail under the ministerial exception because he's a minister, suing his church, and his claims arise out of the internal governance of the church. Second, they fail under the broader church autonomy doctrine because it's impossible to adjudicate his claims without religious entanglement. And third, they fail on the merits because he has not met his burden of proof on the elements of defamation. And before I turn to the First Amendment, I'd just like to address the damages question. Your Honor, Carol v. Trump was a defamation per se case. It's clear that special damages, he has disclaimed the special damages. That's Joint Appendix 75 is an example in his complaint where he divides up the general damages that he claims and the special damages that he claims. He lists the special damages, and those are the damages that he has disclaimed. He has disclaimed those? Yes. In his brief on appeal? Yes. Yeah, that's, yeah. In his brief on appeal and at docket 143-1 in the summary judgment record. So that could end. That, you can dismiss the case on that grounds, on those grounds. But I'd like to turn. There seems to be some misunderstanding about the disclaimer, but go ahead. I'm sorry. I believe he hasn't tried to call back that disclaimer. No. I'd like to talk about the ministerial exception because that's the way that most courts address cases like this where you have a minister suing his church in a way that interferes with a church-minister relationship. Can I ask you a question? Just a first-order question. So if it was pollusively clear that as a matter of New York State law the claim for defamation fails, but there were these other issues, the ministerial exception, the ecclesiastical doctrine and so on, abstention doctrine and so on, why would we avoid the constitution or constitution-related questions and just rest on the basic issue of New York law? You can certainly dismiss the case, dismiss all the claims on the merits without any problem. The ministerial exception is a threshold structural constitutional issue, so you do see courts addressing it before the statutory. I see it the other way, too. You see it both ways. Yeah. The Billard case is an example of the court addressing the ministerial exception before the statutory cases, and most courts do it when you have a claim by a minister against his church and it's a defamation claim related to the church's internal governance or faith and doctrine. Most courts will address the ministerial exception. Most recently, the McRaney case in the Fifth Circuit is an example of that. It's not a jurisdictional question, but it is sort of logically prior. That's correct. It's about whether a court could address these kinds of questions at all. Yes. Yes. Even though it is an affirmative defense and not a jurisdictional question, as this court said in the First Valley opinion, it is a threshold structural constitutional question. And why is it the ministerial exception as opposed to the church autonomy doctrine, you said? So he's not actually being hired as the minister, right? He's not employed by the church, but he is a minister of the church. And there are ministerial exception cases addressing non-employers. McRaney in the Fifth Circuit is one. Starkey in the Seventh Circuit. This may be just a linguistic quibble, but exception to what? I always thought the ministerial exception is a Title VII kind of doctrine that creates an exception to what would otherwise be an employment discrimination claim. But in a context other than a Title VII context, isn't really that just a branch of the church autonomy doctrine? I mean, it's an exception to defamation law. It's an exception to life in general. I mean, I don't – as I said, this may just be a quibble about what you call it, but it seems to me that this is a branch of the church autonomy doctrine that, as it impacts certain employment law situations, creates an exception, which I don't know whether the courts have just read it into Title VII in some sense as implied in the statute. But if it's implied as a result of constitutional law, the doctrine that leads to its being read into Title VII is church autonomy. Right. So the ministerial exception is fully within the church autonomy doctrine, so you can call it whatever.  You can, of course, call it whatever they want. And it did – you know, the Hosanna-Tabor case was in the employment discrimination context, so that's why the – you know, that's – Yeah, I mean, there are different – there are different branches or implications of church autonomy, one of which has to do with hierarchical relationships and hiring and who gets to be a minister and who gets to speak for the church. A separate branch would include intrusions into other aspects of church governance or church governance including who they hire. Another would be inquiring into church doctrine and things like that. There are many different ramifications, but that's one of them. Yes, and all of those are present in this case. You have – it's the case – Because you do agree that the ministerial exception is in the branch of church autonomy. Yes. So it flows from church autonomy. Yes. The Venn diagram of ministerial exception and church autonomy is concentric circles. So everything within the ministerial exception is within the church autonomy doctrine. And even if he wasn't a minister, there would be entanglement problems under the church autonomy doctrine because his defense – the church's defense requires statements of church law and the assessment of credibility of the – So does it matter if it requires statements of church law, or is it just that if it involves a court in any kind of governance question of the church, the court can't intervene? Right. So this case arises out of the internal governance of the church. It involves the church's statement about clergy elevation and the election process. I know that it does. So, like, right, so the letter that, you know, is the purported defamation does talk about internal processes of the church and so on. I guess I'm just curious about the case. Let's say the version of events is right, that you could just sort of decide a narrow factual question as to whether a purportedly defamatory statement was true or false without getting yourself involved in religious questions. Because that still involves the hiring and firing of ministers, you would say that the church autonomy doctrine would still say that you can't intervene. Correct, because the case arises out of an internal church governance document. So the letter, you know, this letter is clarifying that he wasn't elected. So why is that? So, like, when we talk about church property disputes, we think that we can apply, you know, we can decide the question by interpreting some kind of property contract without involving the court in religious questions. The court can adjudicate that. So why is this kind of a case different? In property cases, you need to decide who owns, you know, the physical property, and courts do need to get involved in those cases. But here there's no physical property. It's just who supported him for bishop and did the church elect him and how did they know that they hadn't elected him? And the church is starting an investigation. So there's no property at issue here. There's nothing for the court to decide. It's clear that this interferes with church governance. You wouldn't disagree that if the church were defaming somebody who was not a minister and was not, or purportedly, allegedly defaming somebody who was not a minister and was not applying for a job or anything. It's like the Russian Orthodox Church issues a press release that just gratuitously accuses somebody out in the world of some kind of bad conduct or something, and he sues for defamation. He could do that, right? A court could. That certainly would not be a ministerial exception case, and it would be actionable. There might be a situation like the S.S.V. Rosen case where it does turn on religious questions. Well, so that's right. That's the point that I'm making. So in that kind of a case, the only reason you'd think why a court wouldn't be able to entertain that is if it did involve the court in religious questions, but otherwise not. But if it's the same scenario, but the person is not just somebody out in society but was an applicant for a job or was a minister within the church, then you're saying it doesn't matter whether it implicates the court in ecclesiastical questions. And I just sort of want to understand why. It's because the ministerial exception is required because courts can't interfere with the church's authority to select, supervise, and remove a minister. And so what the Our Lady of Guadalupe case- He is disclaiming in this case all of that. He is disclaiming all of that. What he's saying is I've been defamed because- and it's a very, very, very discreet statement involving the Metropolitan. And the statement is quite simply the following. I have a statement, but maybe Mr. Rivkin on rebuttal can help dissuade me of this. The statement is the Metropolitan knew nothing about the written appeals directed to Moscow, basically. Is that right? That's where we are. I think that's the only statement that he claims is- I mean, assuming the waivers and so on. So he is not asking-he's not-that's the only statement as I understand it. Speaking of disclaimers, he is disclaiming anything other than I want to show that this was a false statement and it harmed my reputation. And I'm happy to talk about merits, but the reason that this still falls under the ministerial exception is he does concede that the ministerial exception applies to protected ministerial decisions. And he cannot just look at one phrase in the letter. Of course he concedes that because it doesn't matter to him. Right. But you have to look at the whole letter. And the protected ministerial decision that the church is making in this letter is to clarify that he's not- he was not elected to the bishopric and to seek an investigation. This letter is starting an investigation. So it's part of the internal church discipline process, an investigation both into the complaints brought against Father Alexander and also into the circumstances under which this false election had been announced. The district court, as I understand it, determined that he waived at least that part where the statement says that it never took place, that is, the election never took place. So we're left with just the statement that the metropolitan knew nothing about the written appeals. Right. I'm trying to understand. If he is disclaiming all these things and just says this is a false statement, maybe this goes back to just earlier questions to Mr. Rifkin, he's disclaiming everything, rightly or wrongly, and or the district court has determined that he waived. So it's sort of the same thing for our purposes. He's disclaiming everything except this statement suggests that I have forged a letter and that the metropolitan did not know about this letter. It's false. I'm not asking for anything. I just want my reputation back. Why is that the subject of any evidence related to internal? I'm sympathetic, but I just don't understand. Any evidence related to any internal church discussions, doctrine, what have you? So on the ministerial exception, it's because the church is saying this is how we know he wasn't elected. It's a narrow case here. He's not saying he was elected. He's saying it's a false statement. Right. So it could be that the metropolitan did not know or knew that it is a false statement he didn't know that it was forged. I'm not suggesting that I was elected. He's disclaiming that. So tell me where. So if you can get out of the ministerial exception by saying, like, the church lied about this one thing, ministers can always find a misstatement in what the church said, and that's because the church's role, like, the church has to be able to talk about its decisions to select, supervise, and remove ministers. And this is a statement responding to false, unauthorized documents explaining that this is how we know he's not elected. What if he had said, I was not elected, I agree. But that is to the extent that it says that I'm a liar or a forger, that is just a lie. I was not elected. I don't want the job. I disclaim everything. I don't want to be part of this, whatever the church organization is. But that's a lie. And it sort of also goes a little bit to what Judge Menasche says. If it's a pure outsider, at some point, you know, what is the limit of this church autonomy doctrine or of the ministerial exception that flows from it? So Our Lady of Guadalupe says the reason for the existence of these religious organizations, in that case it's talking about religious teachers, is passing on the faith. And so if that relationship, if the relationship of those teachers is related to the core religious mission of the church, then that relationship is protected. And here we're talking about speech related to the core religious mission of the church. If the church, if a religious organization says X about one of us, it just says this person is not a churchgoer or is not religious or is not a person of faith. And I find that not only offensive but defamatory for whatever reason. And I sue. You're saying I can't sue. Well, the church's decision about whether or not you're a person of faith, I think that's a religious question. It's not a ministerial exception question. So that I get. So what if the church or some religious organization says something truly outlandish that has nothing to do with church doctrine per se? I cross the street illegally. And that harms my reputation. There's some damages that flow from that. Where is the church? So that does not involve church governance or faith and doctrine. And you could imagine a statement from the church about its minister that doesn't involve church governance or faith and doctrine. Like, that minister is bad at his second job running a Burger King, and you should go to the McDonald's down the street. That does not interfere with a church-minister relationship. But where you're talking about whether or not, you know, the church is responding to false, unauthorized documents saying that someone was elected to the bishop. This is an international scandal that has arisen all of a sudden. The church has to respond quickly and delicately. And the scandal, you know, now that we have the facts, we know that it's due in part to Father Alexander's own actions. So he is not, this is not just out of the blue. For the church, for you to decide, for the courts to be able to decide whether or not a certain statement in the state, like a certain clause in the statement is a lie, that's for the church to decide when the church is talking about its internal procedures of elevating the minister to the bishopric or disciplining a minister. So tell me if this is right. It sounds like you have sort of two responses to this general line of questioning. One is, if you think that the church autonomy doctrine is based on avoiding the church being involved in ecclesiastical questions, you're saying you can't just take this one statement in isolation because it's entwined with their whole explanation for why they're not appointing him. And certainly the district court thought that even if it was focused on the one statement, you know, fully adjudicating that would involve an ecclesiastical question. So there's that point. But then also that I had asked the question and you never really got a chance to answer, so I kind of want to hear the answer, which is even if it wouldn't involve the court in ecclesiastical questions, because it implicates the church's governance, that itself is a reason for the court to abstain. Right. So that's right. Even if it were true that you didn't have to decide a religious question. And so I had said, well, if it's somebody who's outside the church, you would have to focus on ecclesiastical questions if it's a property dispute. So then maybe just give me that full answer you were going to give before about why the church self-government is different. Sure. So this case arises from the church's statement about clergy elections and clergy supervision. And that makes this case fall under the ministerial exception and the broader church autonomy doctrine. And then you then you also have the religious questions in the case and internal. So I get that it falls under the doctrine. I just I'm sort of thinking about what are the roots of the doctrine. Is it just that, you know, the way the free exercise clause works is that religious religious people have to get together and form a congregation. And so, of course, we're like regulating that pervasively. It would be a problem. And so therefore, you know, we think that it's just a sphere in which secular courts can't intervene. Is that yes. Yeah. Yeah. Justice Thomas's concurrence in the Catholic. The Catholic Charities case this last term talks about the spheres of governance between the civil sphere and the church sphere. It's because the Kedroff case says churches need to have independence in matters of faith and doctrine and closely related church governance. And this is a closely related matter of church governance. Isn't this basically isn't this maybe slightly souped up version of New York Times against Sullivan? It's sort of, you know, if I say nasty things about my neighbor and that harms the neighbor's reputation in the community, that can be defamation. But if instead of me saying something nasty about my neighbor, it's Donald Trump saying something nasty about Joe Biden during the. Well, maybe even now, but certainly during election campaigns, we don't want to get into that very much. Right. There's a certain amount of mudslinging that's going to go on in elections. And that's part of a free people's ability to govern themselves. And this is the same thing under the religion clause, or at least an analogous thing under the religion clause that statements made in the context. In other words, instead of Trump and Biden, it's Cardinal X and Cardinal Y after the last pope has died. And they're each saying things about why the other shouldn't be elected pope, which include things that would be accusations of serious wrongdoing where we're even less likely to want to get involved in that. Isn't that the point? Exactly. This is about this is about an internal. It's not even employment. It's worse than employment. It's elevation to a position of authority in the church. And the church needs to be the church officials who are responsible for doing that. We can't get into policing their behavior and the content of the allegations that are made back and forth in that situation. Isn't that your position? Yes, it is. Exactly. OK, I do have one question about that, though, because couldn't that have been figured out? I mean, I I'm in a fortunate position as a senior judge. I didn't have to weigh in on the thing that happened at the beginning of this case. So I have no dog in that fight, but I am bound by what came out of it. My instinct here is that but this is summary judgment. This is different. This is not just a maybe we should find out what's really going on, at least to the extent of is this related to as it may look on the surface to church doctrine. And now we've heard it all. Everybody's been deposed. And as I look at it now, it seems to me, frankly, that you are right. But is it what what would I point to to say this is something that comes out of the summary judgment record rather than something that, you know, what I'm really saying is with the benefit of hindsight, maybe this could have been known from the beginning. What wasn't known at the beginning, if anything? So now you can see that the church is responding to false unauthorized documents. You can see like you can see that Father Alexander, this is not something that the church is saying out of the blue, but it's but he he participated. He he he visited the visit Moscow and met with the patriarch. We have a whole we have a whole context, a much bigger context than just the face of the letter itself, from which we could see what kind of internal electoral struggle is happening. Yes. And the first panel held, you know, ruled on a narrow jurisdictional issue, as Judge Lohier put it at the en banc stage and said, you know, the court did not have jurisdiction to decide it at that stage. And it said that the discovery can proceed without violating church autonomy doctrine. And so the church has participated in discovery. And at this point, it is clear that you cannot go further without entanglement. Well, just to be clear, the only question before us was whether we could review that decision. Exactly. Exactly. All right. So thank you very much. Very helpful. Mr. Rifkin, did you hear all that? Yeah, I did. I did. You would have told me otherwise. So you have two minutes. Yeah, I'm just going to very I'm going to be very brief. I want to make a point on the issue of damages. This is a claim for defamation per se. Accusation of criminal defamation. I'm sorry. Accusation of forgery is a criminal accusation and that under New York law is defamation per se. So we did say that in our brief so that I just this to make sure that you're relying. How can it be defamation per se? If you're relying on handwriting experts, you're relying on. How can that be defamation per se? You know what? You're relying on all sorts of different facts beyond just the statement. We have we have a defamation per se charge and we have a defamation per se and we have a defamation claim, regular defamation claim. And I'm not sure I don't think that relying on experts is for special damages. Right. You're saying that you're saying that relying that it is defamation per se to accuse someone of forgery. If there's any issue about the per se-ness, it is that there is a kind of this is an implied allegation of forgery. But the fact that I mean, if it was a flat up, straight up statement, he forged these letters. That's he wrote that signature. And you have a handwriting expert that doesn't defeat the notion that it is that if it is a false accusation, it is defamation per se. Well, whether you rely on a handwriting expert or anything else that you rely on, he will prove that that allegation is false. That's not the subject of what makes it defamation per se or not. What makes it defamation per se is that is that it's an accusation of criminal conduct. Right. Reasonably understood by a jury. This this is an accusation that he had forged and fabricated the letter. And that is a charge of criminal conduct, which is that you knew nothing about the written appeals. OK, all right. That's fine. It's OK. And just to be and just to be clear on the issue of waiver, the judge, the district judge said that we had carried back our claims. There's been no there was no carrying back. Our defamation claims remains exactly the same as from the day that it was filed. You read the complaint. It clearly says that we strictly focused on only one charge, and that is that he was a forger. There is nothing else. We were very careful in drafting the complaint. So this notion that this idea that the judge kind of said several times in his opinion that somehow we have pared down the claim. And we never that that is just incorrect. We never claim that we that he was falsely accused of not having been elected. That is that has never been part of our claim. We've always said it's only this. In fact, it says so on the first page of the complaint and maybe the second one where we say that this is not we're not delving into issues of election or any doctrinal issues. So I just want to make sure that you also if you have questions, I'll answer that. Otherwise, this has been very helpful. Thank you very much. Very helpful from both sides. We'll reserve the session.